RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Joseph L. Schwartz, Esq. (JS-5525)
Kevin J. Larner, Esq. (KL-8627)
Tara J. Schellhorn, Esq. (TS-8155)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800

Counsel to the Plaintiff, Raritan Hospitality, LLC

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>RARITAN HOSPITALITY, LLC,<br><br>Debtor. | Case No. 10-42099 (KCF)<br><br>Hon. Kathryn C. Ferguson, U.S.B.J.<br><br>Chapter 11 |
| RARITAN HOSPITALITY, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>LIFCO HOTELS, LLC,<br><br>Defendant. | Adv. Pro. No. 11-_____ (KCF) |

**COMPLAINT TO AVOID AND RECOVER FRAUDULENT
AND PREFERENTIAL TRANSFERS PURSUANT
TO 11 U.S.C. §§ 544, 547, 548 AND 550**

Plaintiff, Raritan Hospitality, LLC, the within Debtor and Debtor-in-possession (the "Debtor"), by and through its counsel, Riker, Danzig, Scherer, Hyland & Perretti LLP, by way of complaint (the "Complaint") to avoid and recover fraudulent and preferential transfers pursuant to 11 U.S.C. § 544, 547, 548 and 550 against Lifco Hotels, LLC ("Lifco"), states as follows:

**JURISDICTION AND VENUE**

1. This is an adversary proceeding seeking to avoid and recover fraudulent and preferential transfers pursuant to 11 U.S.C. §§ 544, 547(b), 548(a) and 550 and N.J.S.A. 25:2-25b, 2-27a, 2-29 and 2-30.

2. The United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

3. Venue properly lies in this Court pursuant to 28 U.S.C. § 1409(a).

4. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## THE PARTIES

5. The Debtor is a New Jersey limited liability company with an address of 3050 Woodbridge Avenue, Edison, New Jersey 08837.

6. Lifco is a Nevada limited liability company with an address at 1102 Teaneck Road, Teaneck, New Jersey 07666.

## STATEMENT OF FACTS

### A. Background

7. On November 2, 2007 (the "Closing Date"), Lifco sold and transferred to the Debtor a hotel business operating under the Holiday Inn flag and land located at 3050 Woodbridge Avenue, Edison, New Jersey 08837 (collectively the "Hotel").

### B. Lifco's Submission of False Customer Satisfaction Surveys to Franchisor so as to Artificially Raise its OSAT Prior to the Closing Date

8. At all relevant times herein, Michael Konig ("Konig") was Lifco's Manager.

9. At all relevant times prior to the Closing Date, Lifco, Konig, and their employees, agents and representatives, including Myra Rivera ("Rivera"), managed and operated the Hotel.

10. Upon information and belief, in addition to performing services related to the management and operation of the Hotel, prior to the Closing Date, Rivera was or had been an employee of a healthcare facility owned and/or operated by Konig.

11. Upon information and belief, prior to the Closing Date, Rivera held herself out as the controller for the Hotel and, until Lifco sold the Hotel to the Debtor on the Closing Date, Rivera was Konig's agent principally responsible for operating the Hotel.

12. In connection with Lifco's sale of the Hotel to the Debtor, Rivera also held herself out as the General Manager of the Hotel both to the Debtor and, upon information and belief, to Holiday Hospitality Franchising, Inc. ("HHFI"), the franchisor for Holiday Inn hotels, and HHFI's administering agent, InterContinental Hotels Group ("IHG").

13. Upon information and belief, prior to the Closing Date, Lifco received one or more default notices from IHG because the Hotel's Overall Satisfaction Score ("OSAT"), based on a 12-month average, had fallen below the minimum score required by HHFI.

14. Failure by Lifco to raise the Hotel's OSAT above the required minimum would have resulted in mandatory property improvements to the Hotel and/or loss of the Holiday Inn franchise.

15. Upon information and belief, prior to the Closing Date, Lifco's practice was to send IHG the e-mail addresses of guests that stayed at the Hotel, to the extent guests provided their e-mail addresses to Lifco. IHG would thereafter e-mail customer satisfaction surveys directly to certain of those guests whose e-mail addresses were provided to IHG by Lifco, the results of which would be used to calculate the Hotel's OSAT.

16. Upon information and belief, prior to the Closing Date, Lifco and/or Konig would receive from IHG, on or about the Wednesday of each week, the Hotel's OSAT, on a weekly basis.

17. Upon information and belief, after receiving one or more OSAT default notices from IHG prior to the Closing Date, Rivera called a meeting of certain of Lifco's employees and

3

4105335.2

directed the Hotel's front desk personnel to pose as unaffiliated guests of the Hotel and begin submitting false customer survey responses to IHG to artificially raise the Hotel's OSAT above the required minimum level.

18. Upon further information and belief, to accomplish this task, Lifco employees were directed to enter their and their relative's names and e-mail addresses as if they had been Hotel guests and then to respond by e-mail to the IHG customer satisfaction surveys with high or the highest scores.

19. Lifco caused hundreds of false customer satisfaction surveys to be submitted to IHG prior to the Closing Date.

20. Konig has admitted in a sworn statement that "[f]rom time to time employees of Lifco including [a manager], were registered overnight guests at the Hotel and, as such, they responded to OSAT customer satisfaction surveys."

21. Further, Rivera has admitted in a sworn statement that she and other employees of Lifco "routinely were registered as guests at the Hotel" and that they took that opportunity to "return customer satisfaction surveys to the franchisor."

22. Upon information and belief, prior to the Closing Date, Rivera routinely instructed Lifco employees to report to her on a weekly or regular basis when they had submitted customer satisfaction surveys to IHG.

23. Upon information and belief, as a result of Lifco's practice of artificially raising the Hotel's OSAT by causing its employees to submit false customer survey responses to IHG, prior to the Closing Date, the Hotel's OSAT eclipsed the minimum level required by HHFI.

24. Upon information and belief, prior to the Closing Date but after Lifco had received one or more default notices from IHG and after the Hotel's OSAT rose above the

4

4105335.2

minimum level required by HHFI, Lifco employees were instructed during weekly meetings to continue to submit customer satisfaction surveys to IHG. This instruction continued until the Closing Date.

### C. Lifco's Overstatement of its Revenues Prior to the Closing Date

25. Upon information and belief, in addition to having its employees submit false customer satisfaction surveys to IHG prior to the Closing Date, Lifco overstated the Hotel's room revenues.

26. For example, prior to the Closing Date, when the Hotel was overbooked, Lifco would book additional rooms at neighboring hotels, and would treat the payments for those rooms at the other hotels as room revenue for the Hotel despite the fact that the Hotel was not generating these revenues for its rooms.

27. Upon information and belief, during one night in or about 2007, prior to the Closing Date, Lifco caused approximately 230 rooms to be booked at neighboring hotels, resulting in Lifco's posting of an approximate $23,000 net profit for that single night, despite the fact that the Hotel did not generate these room revenues that evening.

### D. Lifco's Failure to Disclose to the Debtor a Law Against Discrimination Lawsuit

28. Lifco failed to disclose to the Debtor a lawsuit that was filed against Lifco prior to the Closing Date, which, upon information and belief, Lifco settled sometime on or before the Closing Date.

29. This lawsuit was brought against Lifco by a disabled guest of the Hotel who used a wheelchair, alleging Law Against Discrimination ("LAD"), The Americans With Disabilities Act ("ADA") and/or related claims, and demanding modifications to the Hotel.

30. Upon information and belief, this lawsuit was settled for a relatively significant monetary payment to avoid having to make the modifications to the Hotel being sought, which modifications Lifco never made to the Hotel.

### E. Lifco's Sale of the Hotel to the Debtor

31. On or about June 29, 2007, Lifco and the Debtor entered into an agreement for Lifco's sale of the Hotel to the Debtor (the "Sale Agreement").

32. Pursuant to Paragraph 5 of the Sale Agreement, Lifco expressly designated Konig as the sole contact on Lifco's behalf and expressly prevented the Debtor from communicating with any persons other than Konig.

33. Pursuant to Paragraph 5 of the Sale Agreement, Lifco was required to make various of the Hotel's books and records available for inspection by the Debtor.

34. Prior to the Closing Date, on a number of occasions, the Debtor requested that Lifco produce to the Debtor all the documents referenced in Paragraph 5 of the Sale Agreement, as well as other documents.

35. Pursuant to Paragraphs 14(e) and (f) of the Sale Agreement, Lifco represented to Debtor that, to "[t]he best of [its] knowledge, there are no violations of any law or governmental rule or regulation pending against [Lifco] or the Property, and [Lifco] has complied with all laws and governmental rules and regulations applicable to the Hotel" and that there "are no judgments . . . suits, actions or proceedings pending or, to the best of [Lifco's] knowledge, threatened against [Lifco] or the Property."

36. Pursuant to Paragraph 14(j) of the Sale Agreement, Lifco further represented to Debtor that "[i]t has no knowledge of any pending or contemplated . . . judicial, administrative or other proceedings affecting the subject matter of this Agreement or any part thereof."

4105335.2

37. Lifco failed to produce to the Debtor certain documents that were relevant and important to the Debtor's purchase of the Hotel, including (i) the false customer satisfaction surveys that Lifco caused its employees to submit to IHG to artificially inflate the Hotel's OSAT, (ii) documents related to the overstatement of the Hotel's room revenues, and (iii) documents relating to the lawsuit against Lifco alleging LAD, ADA and/or related claims.

38. Pursuant to Paragraph 1 of the Sale Agreement, Lifco agreed to assign all of its "rights, title and interest" "to the trade names, trademarks and service marks of [Lifco] with respect to the name, trademark or service mark of the 'Holiday Inn.'"

39. Pursuant to Paragraph 10(i) of the Sale Agreement, Lifco further agreed to provide "all other records and documents necessary to permit the continuance of orderly operation of the Holiday Inn."

40. Paragraph 33 of the Sale Agreement contained the following language: "The Seller's and Buyer's obligation to perform under this Agreement is expressly conditioned upon the Buyer's ability to secure at its own expense a written approval from the Holiday Inn franchisor agreeing to: (a) designate the Buyer as the replacement franchisee for the Seller under the terms of the existing Franchise Agreement or at the request of the Buyer, a new Franchise Agreement, to the extent available from Franchisor[.]"

41. On the Closing Date, Lifco and the Debtor entered into a Closing Agreement, dated November 2, 2007, which incorporated the Sale Agreement.

42. The Closing Agreement was signed by Konig as Managing Member of Lifco.

43. The Closing Agreement was drafted by or on behalf of Lifco.

44. At all relevant times herein, Lifco was 100% owned by The Philanthropists Charity ("Charity"), for which Konig acts as the Trustee.

7

45. On or around the Closing Date, Konig, as Trustee for Charity, the sole member of Lifco, executed a November 2, 2007 Bill of Sale.

46. Moreover, in his Affidavit of Creditors executed on the Closing Date, Konig swore under oath that Lifco had contracted to sell to Debtor the "Business," defined as the hotel that Lifco operated "under the trade name of Holiday Inn[.]"

47. At no time at or prior to the Closing Date did Lifco, or any of its employees, agents, or representatives inform the Debtor (i) that Lifco had received default notices from IHG prior to the Closing Date concerning the Hotel's OSAT, (ii) that customer satisfaction survey responses had been submitted to IHG by Lifco's employees, (iii) that Lifco had overstated its room revenues, or (iv) that Lifco was a defendant in a lawsuit alleging LAD, ADA and/or related claims.

48. At no time at or prior to the Closing Date was the Debtor aware (i) that Lifco had received default notices from IHG prior to the Closing Date concerning the Hotel's OSAT, (ii) that Lifco's employees had submitted customer satisfaction survey responses to IHG, (iii) that Lifco had overstated its room revenues, or (iv) that there was a lawsuit against Lifco alleging LAD, ADA and/or related claims.

49. Lifco's fraudulent misrepresentations and/or omissions caused the perceived value of the Hotel to be significantly overstated on the Closing Date.

**F.    The Debtor's Payments and Obligations Made or Incurred on and After the Closing Date**

50. On the Closing Date, the Debtor agreed to pay Lifco $16.7 million for the Hotel, consisting of a $4 million payment to Lifco on the Closing Date, the Debtor's execution of a Promissory Note in favor of Lifco (the "Note"), as well as a Mortgage and Security Agreement (the "Mortgage"), both dated November 2, 2007.

8

51. The Debtor paid Lifco the sum of $4 million on the Closing Date (the "Initial Payment").

52. After the Closing Date, and through and including September 2010, the Debtor made monthly payments pursuant to the Note and the Mortgage of principal and interest to Lifco, each in the amount of $81,826.28. These payments totaled $2,782,093.52 (the "Monthly Payments").

53. Consequently, on and since the Closing Date, the Debtor made payments to Lifco totaling $6,782,093.52 (the "Lifco Payments"). A schedule detailing the Lifco Payments is attached as Exhibit "A."

### G. The Debtor's Bankruptcy Filing.

54. On October 15, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey.

### COUNT I
### (Fraudulent Transfers - 11 U.S.C. § 548)

55. The Debtor repeats and re-alleges the allegations contained in each and every prior paragraph as if fully set forth at length herein.

56. Lifco knew that if Lifco's low OSAT score did not get remedied, then Lifco would have been required to make substantial capital improvements to the Hotel or the Hotel would lose the Holiday Inn flag, which Lifco knew would significantly devalue the Hotel.

57. Lifco further knew that if Lifco disclosed to the Debtor the lawsuit against the Hotel alleging LAD, ADA and/or related claims, then Lifco would have been required to make the required capital improvements to the Hotel or the Hotel would potentially lose the Holiday Inn flag, which Lifco knew would significantly devalue the Hotel.

4105335.2

58. Lifco further knew that Lifco's overstatement of its room revenues artificially inflated the value of the Hotel.

59. On and since the Closing Date, the Debtor transferred to Lifco the Note, the Mortgage and the Lifco Payments (collectively, the "Transfers").

60. Certain of the Transfers occurred within two (2) years before the Petition Date.

61. As a result of the false representations, statements, omissions, and promises made by Lifco, the value of the Hotel was significantly less than the $16.7 million sale price agreed to by the Debtor. As a result, the Debtor received less than a reasonably equivalent value in exchange for the Transfers.

62. At the time the Debtor made the Transfers, the Debtor was insolvent, or the Debtor became insolvent as a result of the Transfers.

63. At the time the Debtor made the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the assets of the Debtor constituted unreasonably small capital.

64. At the time the Debtor made the Transfers, the Debtor involuntarily intended to incur, or involuntarily believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as such debts matured.

65. The Transfers constitute transfers to Lifco of interests of the Debtor in property.

66. During the two (2) year period prior to the Petition Date, the Debtor made payments to Lifco totaling, at a minimum, $1,882,004.44.

67. The Debtor is entitled to avoid all Transfers made within two (2) years before the Petition Date under 11 U.S.C. § 548(a)(1)(B).

4105335.2

68. The Debtor is entitled to recover the value of all Transfers made to Lifco within two (2) years before the Petition Date under 11 U.S.C. § 550(a).

WHEREFORE, the Debtor demands judgment against Lifco as follows:

a. avoiding all Transfers made to Lifco within two (2) years before the Petition Date;
b. recovering and preserving for the benefit of the estate, the value of all Transfers made to Lifco within two (2) years before the Petition Date;
c. disallowing Lifco's claims pursuant to 11 U.S.C. § 502(d);
d. awarding attorneys' fees and costs; and
e. for such other and further relief as the Court deems just and equitable.

### COUNT II
### (Fraudulent Transfers - 11 U.S.C. § 544)

69. The Debtor repeats and re-alleges the allegations contained in each and every prior paragraph as if fully set forth at length herein.

70. At all relevant times, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

71. At all relevant times, the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they become due.

72. The Debtor is entitled to avoid all of the Transfers under N.J.S.A. 25:2-25b, 2-27a, 2-29 and 2-30, made applicable herein under 11 U.S.C. § 544.

73. The Debtor is entitled to recover the value of all of the Transfers under 11 U.S.C. § 550(a).

WHEREFORE, the Debtor demands judgment against Lifco as follows:

a. avoiding all Transfers made to Lifco;
b. recovering and preserving for the benefit of the estate, the value of all Transfers made to Lifco;

    c.    disallowing Lifco's claims pursuant to 11 U.S.C. § 502(d);
    d.    awarding attorneys' fees and costs; and
    e.    for such other and further relief as the Court deems just and equitable.

## COUNT III
### (Preferential Transfers - 11 U.S.C. § 547)

74.    The Debtor repeats and re-alleges the allegations contained in each and every prior paragraph as if fully set forth at length herein.

75.    During the ninety (90) day period preceding the Petition Date (the "<u>Preference Period</u>"), the Debtor made, at a minimum, the following payments (the "<u>Preferential Payments</u>") to Lifco:

| Payment Date | Preferential Payment Amount |
|---|---|
| 8/17/2010 | $81,826.28 |
| 9/17/2010 | $81,826.28 |
| **TOTAL:** | **$163,652.56** |

76.    During the Preference Period, the Debtor was insolvent.

77.    During the Preference Period, Lifco was a creditor of the Debtor.

78.    The Preferential Payments made by the Debtor to Lifco constitute transfers of interests of the Debtor in property to or for the benefit of Lifco, a creditor of the Debtor.

79.    The Debtor made the Preferential Payments to Lifco for or on account of an antecedent debt, the Note, which was a debt that the Debtor owed to Lifco before the Preferential Payments were made.

80.    The Preferential Payments were made to Lifco while the Debtor was insolvent.

81.    The Preferential Payments enabled Lifco to receive more than it would have received if: (a) the Debtor's case was a Chapter 7 liquidation case; (b) the Preferential Payments had not been made; and (c) Lifco received payment on its claim against the Debtor to the extent provided by the provisions of the Bankruptcy Code.

4105335.2

82. As a result of the foregoing, the Preferential Payments are avoidable and recoverable by the Debtor pursuant to 11 U.S.C. §§ 547(b) and 550.

**WHEREFORE,** the Debtor hereby demands judgment against Lifco as follows:

a. avoiding the Preferential Payments;
b. recovering and preserving for the benefit of the estate the value of the Preferential Payments;
c. disallowing Lifco's claims pursuant to 11 U.S.C. § 502(d);
d. awarding attorneys' fees and costs; and
e. for such other and further relief as the Court deems just and equitable.

Dated: January 20, 2011
      Morristown, New Jersey

                                RIKER, DANZIG, SCHERER, HYLAND
                                & PERRETTI LLP

                                By: /s/ Joseph L. Schwartz
                                Joseph L. Schwartz (JS-5525)
                                Headquarters Plaza, One Speedwell Avenue
                                Morristown, NJ 07962-1981
                                (973) 538-0800

                                Attorneys for Plaintiff, Raritan Hospitality, LLC

4105335.2

# EXHIBIT A

# EXHIBIT A TO COMPLAINT

| Payment Date | Payment Amount |
|---|---|
| 11/02/2007 | $4,000,000.00 |
| 12/17/2007 | $81,826.28 |
| 12/31/2007 | $81,826.28 |
| 02/02/2008 | $81,826.28 |
| 03/03/2008 | $81,826.28 |
| 03/31/2008 | $81,826.28 |
| 05/01/2008 | $81,826.28 |
| 06/02/2008 | $81,826.28 |
| 07/01/2008 | $81,826.28 |
| 08/01/2008 | $81,826.28 |
| 09/01/2008 | $81,826.28 |
| 10/03/2008 | $81,826.28 |
| 10/31/2008 | $81,826.28 |
| 12/01/2008 | $81,826.28 |
| 01/01/2009 | $81,826.28 |
| 02/02/2009 | $81,826.28 |
| 03/04/2009 | $81,826.28 |
| 04/02/2009 | $81,826.28 |
| 05/01/2009 | $81,826.28 |
| 06/01/2009 | $81,826.28 |
| 07/02/2009 | $81,826.28 |
| 08/03/2009 | $81,826.28 |
| 09/03/2009 | $81,826.28 |
| 10/02/2009 | $81,826.28 |
| 11/10/2009 | $81,826.28 |
| 12/02/2009 | $81,826.28 |
| 01/06/2010 | $81,826.28 |
| 02/04/2010 | $81,826.28 |
| 03/05/2010 | $81,826.28 |
| 04/10/2010 | $81,826.28 |
| 05/18/2010 | $81,826.28 |
| 06/14/2010 | $81,826.28 |
| 07/12/2010 | $81,826.28 |
| 08/17/2010 | $81,826.28 |
| 09/17/2010 | $81,826.28 |
| **Total Payments:** | **$6,782,093.52** |